## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

Case No.  13-32471

IVENS PROPERTIES, INC.

Debtor

## MEMORANDUM ON CONFIRMATION OF
## IVENS PROPERTIES, INC. AMENDED PLAN OF
## REORGANIZATION DATED MARCH 18, 2014

**APPEARANCES:**   QUIST, CONE & FISHER, PLLC
Michael H. Fitzpatrick, Esq.
2121 First Tennessee Plaza
800 South Gay Street
Knoxville, Tennessee  37929-9711
Attorneys for Debtor

GENTRY, TIPTON & MCLEMORE, P.C.
W. Morris Kizer, Esq.
Post Office Box 1990
Knoxville, Tennessee  37901-1990
Attorneys for Capital Bank, N.A.

SAMUEL K. CROCKER, ESQ.
UNITED STATES TRUSTEE
Kimberly C. Swafford, Esq.
Historic U.S. Courthouse
31 East 11th Street
Chattanooga, Tennessee  37402
Attorneys for United States Trustee

**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

Before the court for confirmation is the Ivens Properties, Inc. Amended Plan of Reorganization Dated March 18, 2014 (Amended Plan) filed by the Debtor on March 19, 2014, the Objections of Capital Bank, N.A. to the Confirmation of the Plan (Objection) filed by Capital Bank, N.A. (Capital Bank) on March 20, 2014, and the Response of United States Trustee to the Debtor's Plan of Reorganization (Response) filed by the United States Trustee (U.S. Trustee) also on March 20, 2014.[1]

The confirmation hearing was held on April 22, 2014.  The record before the court consists of twenty-nine exhibits entered into evidence, the Joint Stipulation of Undisputed Facts Regarding Confirmation of the Debtor's Plan of Reorganization (Joint Stipulations) filed by the parties on April 15, 2014, and the testimony of five witnesses, Van Elkins, Charles Wesley (Chad) Benton, III, Glynis Tilley, Christopher Sigmund, and Mark Ivens.

This is a core proceeding.  28 U.S.C. § 157(b)(2)(L) (2006).

# I

The Debtor, a single asset real estate debtor as defined by 11 U.S.C. § 101(51B) (2006), filed the Voluntary Petition commencing its Chapter 11 case on July 3, 2013, and has operated since that date as a debtor-in-possession.  Its primary asset is real property located at 521 W. Lamar Alexander Parkway, Maryville, Blount County, Tennessee, consisting of two brick office buildings each with

---

[1] In his Response, the United States Trustee does not specifically object to confirmation of the Amended Plan. Rather, he states that the Amended Plan "may not be confirmable under 11 U.S.C. § 1129(a)(11)."  Relying on Capital Bank to prosecute its Objection on the § 1129(a)(11) issue, the United States Trustee, although appearing at the trial, did not participate.  To the extent the United States Trustee considers the Response an objection to confirmation of the Amended Plan, the court deems that objection withdrawn.

two rentable levels, a ground level and a basement level (collectively, Ivens Office Building). Building One is the larger of the two, containing approximately 10,000 rentable square feet, while Building Two contains approximately 5,000 rentable square feet. *See* TRIAL EX. 11 at 5. Mark Ivens is the Debtor's president and, since December 2009, its sole shareholder.

On December 10, 2009, the Debtor executed a Note in favor of GreenBank, predecessor in interest to Capital Bank, evidencing an indebtedness of $950,000.00, with a maturity date of December 5, 2012. TRIAL EX. 1. On January 28, 2013, the Debtor and Capital Bank entered into a Change in Terms Agreement which, *inter alia*, extended the maturity date of the original Note to April 28, 2013. TRIAL EX. 3. When the Note was not paid by April 28, 2013, Capital Bank gave notice of a foreclosure, which it scheduled for July 11, 2013. The foreclosure was thereafter stayed following the Debtor's bankruptcy filing on July 3, 2013. Since the filing of its bankruptcy case, the Debtor has paid the property taxes for 2013 owed to Blount County, Tennessee, and it has filed its monthly operating reports through March 31, 2014. The Debtor is likewise current in the payment of its quarterly fees owed to the United States Trustee. On November 4, 2013, Capital Bank filed Claim #3 in the amount of $974,067.15 in the Debtor's bankruptcy case, representing the amounts due under the December 10, 2009 Note, plus other obligations owed to Capital Bank including the property taxes owed on the Ivens Office Building for 2010, 2011, and 2012, all of which were paid by Capital Bank in 2013. TRIAL EX. 10. Capital Bank's claim is secured by the Ivens Office Building pursuant to a Deed of Trust recorded with the Register of Deeds for Blount County, Tennessee, on December 11, 2009. TRIAL EX. 2. As of the April 22, 2014 trial date, the total payoff

due and owing by the Debtor to Capital Bank, including legal and appraisal fees through March 21, 2014, was $1,041,932.66. TRIAL EX. 4.

On March 19, 2014, the Debtor filed its Amended Plan together with Ivens Properties, Inc. Amended Disclosure Statement Dated 3/19/2014 (Amended Disclosure Statement), which was determined to contain adequate information and was approved by an Order Approving Disclosure Statement, As Amended, Fixing Time for Filing Acceptances or Rejections of Plan, Fixing Time for Filing Objections to Confirmation, and Fixing Date for Hearing on Confirmation, Combined With Notice Thereof entered on March 3, 2014. *See* TRIAL EX. 11; TRIAL EX. 12. The Amended Plan proposes treatment for five classes of claims and interests to be funded through rents the Debtor receives from its tenants: (1) Class 1, which is unimpaired, consists of administrative claims to be paid in cash on the effective date of the plan or in monthly installments if there is insufficient cash; (2) Class 2, which is stated by the Debtor to be impaired, consists of priority tax claims that will be paid in full, plus interest, through monthly installments over the period ending not more than sixty months from the petition date;[2] (3) Class 3, which is impaired, consists of the allowed secured claim of Capital Bank that will receive monthly payments in the amount of $4,791.83, plus 4.25% interest, beginning within twenty days after the effective date of the plan amortized over thirty years, with a balloon payment on or before month 120, and will retain its lien until its claim is paid in full; (4) Class 4, which is impaired, consists of allowed general unsecured claims to be paid $278.51 per month, plus interest at the current federal judgment rate, amortized over sixty months, beginning within thirty days after the effective date of the plan or payment in full of Class 1, whichever is later;

---

[2] Although designated by the Debtor in the Amended Plan as classes, the claims encompassed within Class 1 and Class 2 are not subject to classification. *See* 11 U.S.C. § 1123(a)(1) (2006).

and (5) Class 5, which is impaired, consists of equity interests, to be retained.  Prior to trial, the

Debtor's counsel announced that it was modifying its proposed treatment of Capital Bank's claim

to reflect a 5.25% interest rate and clarifying that not only would Capital Bank retain its lien until

paid in full, but all of the original default provisions of the Note and Deed of Trust would be in effect

throughout the term of the plan.

Balloting commenced, and on March 24, 2014, the Debtor filed a Ballot Summary,

evidencing that the Amended Plan was accepted by Classes 2,[3] 4, and 5, and was rejected by Class 3.

Capital Bank filed its Objection to confirmation and the United States Trustee filed his Response

each on March 20, 2014.  As stated in the Joint Statement of the Issues for Determination Regarding

Confirmation of the Debtor's Plan of Reorganization filed by the parties on April 15, 2014, the

issues are (1) whether the Amended Plan is feasible as required by 11 U.S.C. § 1129(a)(11); and

(2) whether the Amended Plan is fair and equitable in its treatment of Class 3 consisting of Capital

Bank as required by 11 U.S.C. § 1129(b)(1) and (2)(A).

## II

The court shall confirm a Chapter 11 plan if it meets the requirements of § 1129, including,

*inter alia*, the following:

> (11) Confirmation of the plan is not likely to be followed by the liquidation, or the
> need for further financial reorganization, of the debtor or any successor to the debtor
> under the plan, unless such liquidation or reorganization is proposed in the plan.

---

[3] *See supra* n.1.

11 U.S.C. § 1129(a) (2006).  If all the requirements of 11 U.S.C. § 1129(a), other than under

paragraph (8),[4] are met, the plan will be confirmed if it "does not discriminate unfairly, and is fair

and equitable, with respect to each class of claims or interests that is impaired under, or has not

accepted, the plan."  11 U.S.C. § 1129(b)(1) (2006).  Additionally, each plan must contain certain

provisions, such as designation of classes, treatment of claims, and adequate means of

implementation, among others, *see generally* 11 U.S.C. § 1123 (2006), and within the context of

class designation and treatment, a debtor is afforded the ability to impair classes of creditors pursuant

to 11 U.S.C. § 1124 (2006).

## A

Capital Bank first objects to the feasibility of the Amended Plan under § 1129(a)(11).

"Feasibility is fundamentally a factual question since it necessarily depends upon a determination

of the reasonable probability of payment[,]" *In re Howard*, 212 B.R. 864, 878 (Bankr. E.D. Tenn.

1997), and the Debtor bears the burden of proof by a preponderance of the evidence.  *In re RADCO

Props., Inc.*, 402 B.R. 666, 678 (Bankr. E.D.N.C. 2009).  A feasible Chapter 11 plan is not required

to "guarantee success, but it must present reasonable assurance of success." *In re Made in Detroit,*

---

[4] Paragraph (8) of § 1129(a) provides:

  (a)  The court shall confirm a plan only if all of the following requirements are met:

    . . .

  (8)  With respect to each class of claims or interests—
    (A)  such class has accepted the plan; or
    (B)  such class is not impaired under the plan.

11 U.S.C. § 1129(a)(8).

*Inc.*, 299 B.R. 170, 176 (Bankr. E.D. Mich. 2003) (citing *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988)).  "[W]hile the determination of the feasibility of a proposed plan is necessarily fact-intensive, the plan need only present a 'reasonable assurance of success' by sufficiently establishing 'a realistic and workable framework for reorganization.'"  *In re Fairvue Club Props., LLC*, 2010 WL 4501959, at \*3 (Bankr. M.D. Tenn. Nov. 2, 2010) (quoting *Gen. Elec. Credit Equities, Inc. v. Brice Rd. Devs., LLC (In re Brice Rd. Devs., LLC)*, 392 B.R. 274, 283 (B.A.P. 6th Cir. 2008)).  "The proponent of a plan of reorganization does not need to guarantee success, but a court cannot confirm a visionary scheme that promises creditors more than the debtor can possibly attain after confirmation, notwithstanding the proponent's sincerity, honesty and willingness to make a best efforts attempt to perform according to the terms of the plan."  *In re Am. Homepatient, Inc.*, 298 B.R. 152, 169 (Bankr. M.D. Tenn. 2003) (internal quotations and citations omitted).  In making a feasibility analysis, the court is required "to scrutinize a debtor's proposed plan payments in light of projected income and expenses in order to determine whether it is likely the debtor will be able to make the payments required by the plan."  *Howard*, 212 B.R. at 879-80.

> Relevant factors to a finding of feasibility are:  (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*In re Hurricane Memphis, LLC*, 405 B.R. 616, 624-25 (Bankr. W.D. Tenn. 2009) (quoting *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.)*, 800 F.2d 581, 589 (6th Cir. 1989) (citation omitted)).

Capital Bank's feasibility argument focuses primarily upon the Debtor's post-petition gross monthly receipts as reflected in its monthly operating reports which, for July through December 2013, averaged $7,840.31 per month, translating to $94,083.72 annually, and for January through March 2014, averaged $9,153.90 per month, translating to $109,846.80 annually, as well as the fact that the Debtor is currently leasing only 70% of the Ivens Office Building, with two of the leases being with businesses owned by Mr. Ivens. Specifically, Capital Bank points out that the Debtor has not been making debt service payments and it has not, in the past, paid its property taxes, requiring lump sum payments to the Blount County Trustee and the City of Maryville within the last couple of months, resulting in negative net income. Additionally, the Amended Plan does not provide for any treatment of the claim filed by the Internal Revenue Service. Capital Bank also argues that the Debtor's projections as reflected in the Projected Rental and Expense spreadsheet for the years 2014 through 2023 (Projections Spreadsheet), which was entered into evidence as Trial Exhibit 13, are speculative because out of the eleven leases which are the Debtor's sole source of income, a number of them are currently on month-to-month terms and of those with longer terms, three are scheduled to expire in October, November, and December of this year, and a fourth lease will expire in March 2015.

In support of confirmation and feasibility, the Debtor relied in large part on the testimony of its Certified Public Accountant, Van Elkins. Mr. Elkins testified that he had prepared the Projected Rentals and Expense spreadsheet attached to the Amended Disclosure Statement before he had any actual data from the Debtor, with information taken from the Debtor's monthly operating reports which were not detailed. However, once he obtained updated and more detailed information,

8

Mr. Elkins revised, as of April 16, 2014, the Projections Spreadsheet to include the more complete information as well as take into account the one percent interest rate increase proposed for Capital Bank's claim.[5]  Taking into account deductions for a management fee, county and city property taxes, franchise taxes, repairs and supplies, fees and permits, insurance, miscellaneous expenses, electricity, accounting and legal fees, and debt service to Capital Bank, the Projections Spreadsheet anticipates a positive cash flow beginning in 2016 and continuing through 2023, which is the remaining term of the Amended Plan.  TRIAL EX. 13.

The Debtor's gross rents, as reflected on its tax returns, were $94,361.00 for 2011, and $117,987.00 for 2012.  TRIAL EX. 17; TRIAL EX. 18.  Pursuant to the Projections Spreadsheet, beginning cash flow in 2014 is $27,100.00.  TRIAL EX. 13.  The Projections Spreadsheet reflects $123,393.00 in gross rental revenue for 2014, increasing to $142,889.00 for 2015, increasing to $165,465.00 in 2016, and finally, increasing to $191,608.00 for 2017 through 2023.  TRIAL EX. 13. In addition to the gross rental revenues, the Projections Spreadsheet includes sign revenues for fees charged bi-annually to tenants and businesses who purchase signage space.  Based upon his estimates, Mr. Elkins projected the following sign revenue, as reflected in the Projections Spreadsheet:  $2,610.00 for 2014, $2,853.00 for 2015, $3,118.00 for 2016, $3,408.00 for 2017, $3,725.00 for 2018, $4,071.00 for 2019, $4,450.00 for 2020, $4,854.00 for 2021, $5,316.00 for 2022, and $5,810.00 for 2023.  TRIAL EX. 13.  Mr. Elkins explained that he based the annual increases in rental income on potential rental rate increases in the future.  His projected numbers

---

[5] The Projected Rentals and Expense spreadsheet attached to the Amended Disclosure Statement did not contain line-item deductions for the property taxes payable to the City of Maryville or for miscellaneous expenses.  *Compare* TRIAL EX. 13 *with* TRIAL EX. 11.

represent gross rental income attributable to the Debtor's goal of maintaining a 90% occupancy rate, and the rising sign revenue reflects anticipated increases as the economy continues to improve.

The Projections Spreadsheet accounts for payment of a number of fixed costs over the term of the Amended Plan, including payment of county and city property taxes totaling $19,343.00 in 2014 and $20,310.00 for 2015 through 2023, payment of $3,000.00 annually to the State of Tennessee for franchise taxes, payment of $20.00 annually for permits and fees, and payment of $8,500.00 annually for electricity. TRIAL EX. 13. The Projections Spreadsheet also includes costs for insurance, repairs and supplies, and miscellaneous expenses that increase each year, such that the Debtor's total expenses in 2014 are projected to be $38,463.00 compared to total projected expenses of $43,320.00 in 2023. TRIAL EX. 13. Legal fees in the amount of $15,000.00 are budgeted for 2014; however, no legal fees are anticipated for the remaining term of the Amended Plan. TRIAL EX. 13. Likewise, the Projections Spreadsheet includes accounting fees in the amount of $4,000.00 for 2014, but the fees are reduced to $2,000.00 annually for the years 2015 through 2023. TRIAL EX. 13. Finally, the Projections Spreadsheet provides for debt service payments to Capital Bank in the amount of $69,043.08 annually for the term of the Amended Plan. TRIAL EX. 13. Based on the foregoing income and expenses numbers, the Projections Spreadsheet reflects the following for the years 2014 through 2023:

|      | net income after debt service | beginning cash flow | cumulative cash flow |
|------|-------------------------------|---------------------|----------------------|
| 2014 | -$28,113.08                   | $27,100.00          | -$1,013.08           |
| 2015 | $7,240.92                     | -$1,013.08          | $6,227.84            |
| 2016 | $29,427.92                    | $6,227.84           | $35,655.76           |
| 2017 | $55,161.92                    | $35,655.76          | $90,817.68           |
| 2018 | $54,732.92                    | $90,817.68          | $145,550.60          |

| 2019 | $54,282.92 | $145,550.60 | $199,833.52 |
| 2020 | $53,809.92 | $199,833.52 | $253,643.44 |
| 2021 | $53,312.92 | $253,643.44 | $306,956.36 |
| 2022 | $52,791.92 | $306,956.36 | $359,748.28 |
| 2023 | $52,244.92 | $359,748.28 | $411,993.20 |

TRIAL EX. 13.

The testimony of Mr. Elkins and Mr. Ivens at trial requires alterations to the numbers reflected in the Projections Spreadsheet. Although the income and basic expense figures are the same, Mr. Elkins testified that the beginning cash on hand has decreased to approximately $21,000.00 after the Debtor paid $10,849.35 to the City of Maryville for property taxes and penalties on April 17, 2014, which Mr. Ivens testified he paid out of the cash reserves and reduced property management fees payable to himself. Mr. Elkins also testified that the Debtor had budgeted attorneys' fees in the amount of $15,000.00 and that, prior to the trial, his own fees had increased to a total of $12,082.00, not including $1,840.00 previously awarded by the court, for total administrative fees of $28,922.00, which exceeds the Debtor's cash on hand and will reduce the net income after debt service and cash flow figures for the term of the Amended Plan. Additionally, the projections do not include a monthly payment to the Internal Revenue Service on its disputed claim, pending the outcome of the investigation currently in process, although Mr. Elkins testified that the monthly payment would not be more than $160.00. Similarly, the Projections Spreadsheet does not include a payment to the State of Tennessee on its claim. Nevertheless, Mr. Ivens testified that the Debtor has not made any debt service payments to Capital Bank, and Mr. Elkins testified that because no debt service payments have been made in 2014, the full $69,043.08 reflected in the

11

Projections Spreadsheet will not be accurate and will be substantially less in 2014, whereby the Debtor's income stream versus its expenses works within the parameters of the Amended Plan and the Projections Spreadsheet.

The court finds that the Debtor has sufficiently shown, based in large part upon the testimony of Mr. Elkins, that the Amended Plan is feasible.  First, the court gives considerable credence to the Projections Spreadsheet revised by Mr. Elkins as of April 16, 2014, and orally revised by testimony at trial.  While it is true that the administrative expenses owed to the Debtor's attorneys and Mr. Elkins totaling $28,922.00 as of April 21, 2014, exceed the Debtor's current cash on hand in the amount of $21,000.00, the debt service payments of $5,753.59 monthly that were not paid to Capital Bank for January through May 2014, totaling $28,767.95 must be deducted from the annual figures reflected in the Projections Spreadsheet.  Assuming the remaining figures are unchanged, the Debtor's cumulative cash flow for 2014 will approximate $20,845.95, consisting of net income of -$7,922.00 offset by the $28,767.95 not paid in debt service.  Furthermore, the $21,000.00 cash reserve does not include any rental income that the Debtor will receive for May or subsequent months, and Mr. Ivens testified that the Projections Spreadsheet includes a $25,000.00 management fee payable to his company every year; however, he is willing to forgo the fee in order to ensure feasibility of the plan.

Additionally, the court does not share Capital Bank's concerns about occupancy or believe that the month-to-month leases are problematic as to the Debtor's projections.  According to Mr. Ivens's testimony, Building 1 has 65% occupancy and Building 2 is 78% occupied, and his goal is to achieve a minimum 90% occupancy rate.  With respect to the occupancy percentage,

12

Mr. Benton, Capital Bank's appraiser, testified that, based upon current market trends and the Ivens Office Building's attributes, including location, he believes that the Debtor can reach the stabilized 90% occupancy rate within one year, a sentiment echoed by Mr. Elkins and reflected in his projections for the Debtor over the term of the Amended Plan.  Mr. Ivens testified that out of the eleven leases, seven are currently month-to-month; however, as reflected in the Rent Roll, the majority of those tenants has occupied their space for years.  *See* TRIAL EX. 14.  For example, the effective date of Idaka America, Inc.'s lease was October 27, 2004, and although the lease expired effective December 1, 2009, the company is still a tenant more than four years later.  TRIAL EX. 14.  Likewise, Joann Lale's lease had an effective date of June 14, 2009, and expired on June 13, 2011; however, she has remained for nearly three additional years on a month-to-month basis.  TRIAL EX. 14.  Mr. Ivens also testified that he is currently in the process of renegotiating and renewing leases with a number of tenants, including Joseph Sullivan, Dr. Leon Yount, and SWBC Mortgage Corporation, whose leases expired on December 31, 2012, July 30, 2013, and September 30, 2013, respectively.  TRIAL EX. 14.  The Rent Roll also reflects that of the eleven tenants, eight have leases effective with dates prior to December 31, 2012, and three have effective dates in 2013.  With respect to the five tenants with expired leases, there is no reason to believe that these tenants who have occupied the same space for a number of years will suddenly decide to vacate.  The court also notes that none of the tenants exercised their month-to-month thirty day option even in the face of receiving two separate notices from Capital Bank in both instances when it attempted to foreclose the Ivens Office Building.  Finally, with respect to the fact that two of tenants are closely-held companies owned and operated by Mr. Ivens, he confirmed that Ivens Realtors and Ivens Realtors Property Management hold long-term leases at a monthly rate of $500.00; however, each lease with

his closely held companies contains a provision that in the event the space is needed by a more

favorable tenant, those companies will give up the space.

**B**

Capital Bank also argues that the Amended Plan is not fair and equitable under § 1129(b)

which provides, in material part:

> (b)(1)   Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

> (2)   For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

>> (A)   With respect to a class of secured claims, the plan provides—

>>> (i)(I)   that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

>>> (II)   that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property[.]

11 U.S.C. § 1129(b).

As an initial matter, the Amended Plan expressly states that Capital Bank will retain its lien

in the Ivens Office Building until its claim is satisfied.  The issue thus becomes one of whether the

14

Debtor is paying Capital Bank deferred cash payments equal to the value of its claim as of the effective date of the plan.

"[V]alue shall be determined in light of the purpose of the valuation and of the proposed disposition or use of the property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest."  11 U.S.C. § 506(a)(1) (2006).  As explained by the Supreme Court, "the value of the property (and thus the amount of the secured claim under § 506(a)) is the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 960, 117 S. Ct. 1879, 1884, 138 L.Ed.2d 148 (1997).  As for the date upon which valuation is set, "Section 506(a) does not direct a court to make the value determination at a fixed or predetermined time.  Rather, it leaves a court with discretion to value the property looking to the 'purpose of the valuation,' and how the property is to be used." *In re Cahill*, 503 B.R. 535, 539 (Bankr. D.N.H. 2013) (citation omitted).

> Courts have split on the timing issue.  Several have adopted a "single-valuation" approach, where the determination of oversecurity for § 506(b) purposes always occurs at a fixe point in time (generally either the petition date or the confirmation date).  Others have adopted a "flexible" approach, giving the bankruptcy court discretion to determine the appropriate measuring date based on the circumstances of the case.

*Prudential Ins. Co. of Am. v. SW Boston Hotel Venture, LLC (In re SW Boston Hotel Venture, LLC)*, ___ F.3d ___, 2014 WL 1399418, at *7, 2014 U.S. App. LEXIS 6768, at *24 (1st Cir. Apr. 11, 2014); *see also In re Garn*, 2013 WL 5723746, at *1, 2013 Bankr. LEXIS 4381, at *4 (Bankr. D. Utah Oct. 21, 2013) ("[A]lthough the total amount of a creditor's claim is fixed as of the petition date under [11 U.S.C.] § 502(b) [(2006)], § 506(a)(1) contemplates the idea of different valuations of a secured creditor's collateral at different times and for different purposes.").

15

These various decisions, regardless of whether they take the bright line or flexible approach, have chosen a number of different points in time to determine the secured status of a claim:  (1) plan confirmation date, (2) plan effective date, (3) date of valuation hearing, and (4) petition date. . . .  The choice can depend on the purpose of the valuation, e.g., the treatment of a claim in a chapter 11 plan, whether a creditor is entitled to post-petition interest under section 506(b), and–the purpose at hand–whether a secured claim may be modified in a chapter 11 plan.

*In re Cahill*, 503 B.R. at 540 (internal citations omitted).  Nevertheless, "most cases, covering all reorganization chapters and types of collateral, having unsurprisingly decided that the confirmation date is generally the appropriate valuation date when dealing with cramdown valuation for confirmation purposes."  *Garn*, 2013 WL 5723746, at *1, 2013 Bankr. LEXIS 4381, at *4 (citing *TD Bank, N.A. v. Landry*, 479 B.R. 1, 8 (D. Mass. 2012) ("It is only logical, after all, that when distributing an asset through a bankruptcy plan that the current value of that asset be used.")).

In its statements and schedules and the Amended Disclosure Statement, the Debtor valued the Ivens Office Building at $2,050,000.00 based upon appraisals made in 2008 and 2009.  *See* COLL. TRIAL EX. 7; TRIAL EX. 11 at 6.  There is, however, nothing in the record to allow the court to find this value as representative of the value today.  The valuations relied upon by the Debtor are too far removed and will not be considered.  On the other side, in preparation of trial, Capital Bank commissioned an appraisal from Valbridge Property Advisors/Meridian Realty Advisors, which was performed by Chad Benton, MAI, CCIM, on March 24, 2014.  Mr. Benton testified that the Ivens Office Building is a "Class B" property, in average condition, and is comprised of just under 15,000 square feet, of which approximately 14,038 square feet is rentable area.  *See also* TRIAL EX. 33 at i.[6]  With respect to location, Mr. Benton testified that it is just outside of the downtown and business

---

[6] Mr. Benton explained at trial that the newest and nicest office properties are typically considered Class A and properties of "average quality" are considered Class B.

areas of Maryville with immediate, level-grade access to the roads it sits between and has a moderate traffic flow. During his inspection of the Ivens Office Building, he had access to all but a couple of locked offices, although he did not ask for access to those offices. Mr. Benton also testified that, other than cordialities, he did not speak directly to any of the tenants concerning their leases or their respective buildings.

Following his appraisal, Mr. Benton prepared an Appraisal Report dated March 31, 2014, in which he assigned a value to the Ivens Office Building as of March 24, 2014, of $1,170,000.00 "as is" and $1,200,000.00 "prospective at stabilization." TRIAL EX. 33. In arriving at the $1,170,000.00 value, Mr. Benton testified that he used the three standard methods used by appraisers: sales comparison, cost, and income capitalization approaches, although he placed the most emphasis on the sales comparison approach, under which he assigned an "as is fee simple market value indication" of $1,160,000.00, and the income capitalization approach, under which he assigned an "as is fee simple market value indication" of $1,170,000.00. TRIAL EX. 33 at 46, 59. There is nothing more in the record beyond the Debtor's statements and schedules and the Amended Disclosure Statement to support the $2,050,000.00 value, which was derived from appraisals in 2008 and 2009, and the court does not deem it an accurate value. The record does, however, contain evidence with respect to the $1,170,000.00 value in the form of Mr. Benton's Appraisal Report and his testimony. Because he focused primarily upon the sales comparison and income capitalization approaches, the court will likewise focus on those two methods, noting, however, that under the cost

approach, Mr. Benton also assigned the Ivens Office Building an "as is fee simple market value indication" of $1,170,000.00. TRIAL EX. 33 at 77.[7]

For the sales comparison approach, Mr. Benton examined six properties sold between October 1, 2012 and September 24, 2013, with unadjusted sales prices ranging from $788,000.00 to $1,700,000.00, and ranging "from $89.95 to $119.11 per square foot, with an average of $108.15 per square foot and a median of $115.38 per square foot." TRIAL EX. 33 at 48, 58. Property adjustments were made for location, age and condition, construction quality, and design/functional utility. With respect to location, the Appraisal Report states that "adjustments may be required when the locational characteristics of a comparable are different from those of the subject. These characteristics can include general neighborhood characteristics, freeway accessibility, street exposure, corner versus interior lot location, neighboring properties, view amenities, and other factors." TRIAL EX. 33 at 56. With respect to age and condition, the Appraisal Report makes the following general statement:

> All else being equal, older properties typically command a lower price per square foot than newer properties. However, although a property may be physically older than another property, the effective age may be similar to a newer property and no adjustment may be indicated. This may be due to the older property being well maintained or a recent renovation. We have based the effective age of the comparables and not their physical age, as this takes the overall condition of a property into consideration. The subject property is in average condition, with an effective age of 22 years.

TRIAL EX. 33 at 57. With respect to construction quality, the Appraisal Report states, generally, that "[t]he subject property consists of average quality, concrete block with brick veneer construction.

---

[7] For the cost approach, Mr. Benton looked at five comparable lots to ascertain the value of the raw land without the improvements of Buildings 1 and 2, which he located through the courthouse retrieval system, by driving around, interviewing brokers, and through the Costar system.

18

The sales generally feature similar quality construction varying from wood frame with brick veneer to masonry and brick veneer." TRIAL EX. 33 at 57. Finally, with respect to design/functional utility, the Appraisal Report states that "[t]he subject property has approximately one-half of its total area comprised by daylight basement space. All things being equal, space of this type is generally somewhat less desirable than main or upper level office space." TRIAL EX. 33 at 57.

Comparable 1 is a two-story office building with 14,272 rentable square feet located in Gallatin, Tennessee, which sold on September 24, 2013, for $1,700,000.00, translating to $119.11 per square foot. TRIAL EX. 33 at 49. This building was built in 2004, was vacant at the time of sale, with Mr. Benton testifying that it had last been leased in June 2013, and was rated as being in average to good condition. TRIAL EX. 33 at 49. Stating that "[t]he location of the sale within a larger, more active metro area is superior to that of the subject[,]" Mr. Benton "applied a negative adjustment of 10% for location." TRIAL EX. 33 at 56. Additionally, Mr. Benton "applied a negative adjustment of 5%" for design/functional utility. TRIAL EX. 33 at 57. After making adjustments, the price per square foot of Comparable 1 was $78.39. TRIAL EX. 33 at 58.

Comparable 2 is a one-story office building with 8,760 rentable square feet located in Knoxville, Tennessee, which sold on July 25, 2013, for $788,000.00, translating to $89.95 per square foot. TRIAL EX. 33 at 50. The building was built in 1962, renovated in 2000, and was rated as being in average condition. TRIAL EX. 33 at 50. Mr. Benton "applied a negative adjustment of 5% for the location of the sale in the larger Knoxville market." TRIAL EX. 33 at 56. Additionally, Mr. Benton "applied a negative adjustment of 5%" for design/functional utility. TRIAL EX. 33 at 57. After making adjustments, the price per square foot of Comparable 2 was $87.79. TRIAL EX. 33 at 58. At

19

trial, Mr. Benton testified that this building is smaller and not as visually attractive as the Ivens Office Building.

Comparable 3 is a one-story office building with 13,000 rentable square feet located in Jackson, Tennessee, which sold on February 28, 2013, for $1,500,000.00, translating to $115.38 per square foot. TRIAL EX. 33 at 51. This building was built in 2001, and was rated as being in average condition. TRIAL EX. 33 at 51. Stating that there are "similar locational characteristics[,]" Mr. Benton did not apply any adjustments for location. TRIAL EX. 33 at 56. He did, however, determine that, with respect to construction quality, this sale was deemed "to be superior to the subject property and has been adjusted downward by 10%." TRIAL EX. 33 at 57. Additionally, Mr. Benton "applied a negative adjustment of 5%" for design/functional utility. TRIAL EX. 33 at 57. After making adjustments, the price per square foot of Comparable 3 was $82.93. TRIAL EX. 33 at 58. Mr. Benton testified that it was vacant at the time it was sold.

Comparable 4 is a two-story office building with 12,640 rentable square feet located in Clarksville, Tennessee, which sold on January 30, 2013, for $1,065,000.00, translating to $84.26 per square foot. TRIAL EX. 33 at 52. This building was built in 1988, and was rated as being in average condition. TRIAL EX. 33 at 52. Stating that "[t]he location of the sale is judged to be similar to that of the subject with no adjustment required[,]" Mr. Benton did not apply any adjustments for location. TRIAL EX. 33 at 57. He did, however, apply "a negative adjustment of 5%" for design/functional utility. TRIAL EX. 33 at 57. After making adjustments, the price per square foot of Comparable 4 was $87.54. TRIAL EX. 33 at 58.

Comparable 5 is a two-story office building with 16,000 rentable square feet located in Knoxville, Tennessee, which sold on December 14, 2012, for $1,450,000.00, translating to $90.62 per square foot.  TRIAL EX. 33 at 53.  This building was built in 1981, and was rated as being in average condition.  TRIAL EX. 33 at 53.  Stating that "[t]he subject location in Maryville is judged to be slightly inferior[,]" Mr. Benton applied "a negative adjustment of 5%[.]"  TRIAL EX. 33 at 57. He did not make any adjustments for design/functional utility, stating that this building "features a significant portion of its total area in the basement and is judged to be similar to the subject."  TRIAL EX. 33 at 57.  After making adjustments, the price per square foot of Comparable 5 was $94.45. TRIAL EX. 33 at 58.  Mr. Benton testified that this building was purchased for owner-occupancy.

Comparable 6 is a one-story office building with 10,640 rentable space located in Bartlett, Tennessee, which sold on October 1, 2012, for $950,000.00, translating to $89.29 per square foot. TRIAL EX. 33 at 54.  This building was built in 2004, and was rated as being in average condition. TRIAL EX. 33 at 54.  Stating that "this is a larger, more active area compared to the subject location[,]" Mr. Benton applied "[a] negative adjustment of 10%[.]"  TRIAL EX. 33 at 57. Additionally, Mr. Benton "applied a negative adjustment of 5%" for design/functional utility.  TRIAL EX. 33 at 57.  After making adjustments, the price per square foot for Comparable 6 was $61.11. TRIAL EX. 33 at 58.  At trial, Mr. Benton testified that this building was only partially occupied, but he did not know the percentage.

After analyzing the sales comparables, Mr. Benton made the following conclusions as to the value of the Ivens Office Building:

21

**Sales Comparison Approach Value Indication**

We have adjusted the comparable sales based on pertinent elements of comparison as discussed earlier . . . .  The final adjusted sale prices reflected a range from $61.11 to $94.45 per square foot, with an average of $82.04 per square foot and a median of $85.23 per square foot.

The most comparable sale was Sale #5, with an adjusted price of $94.45 per square foot.

Based on the adjusted prices and the most comparable sale, a unit value for the subject property is near the middle of the adjusted range, or $85.00 per square foot. This indicates a preliminary prospective at stabilization fee simple market value indication of $1,193,230.

**As Is Fee Simple Market Value Indication**

The preliminary market value indication is based on the subject property operating at a stabilized occupancy.  However, the subject property is currently operating at a below-stabilized occupancy level of 75.0%, requiring a lease-up adjustment. A lease-up discount of $30,000 was previously estimated in the cost approach.

Applying these adjustments to the prospective at stabilization fee simple market value indication indicates a [sic] as is fee simple market value indication of $1,160,000 (rounded), as of March 24, 2014, based on the sales comparison approach.

## VALUE INDICATION

Improved Sales Comparison Approach Value Indication

**Primary Site - Indicated Reasonable Value Range**

| | | | |
|---|---|---|---|
| 14,038 sf | x | $75.00 | = | $1,052,850 |
| 14,038 sf | x | $90.00 | = | $1,263,420 |

**Preliminary Prospective At Stabilization Fee Simple Value Indication**

| | | | |
|---|---|---|---|
| 14,038 sf | x | $85.00 | = | $1,193,230 |

**Prospective At Stabilization Fee Simple Market**
**Value Indication**                            **$1,190,000**
   Less Lease-Up Discount:                  $   30,000
**As Is Fee Simple Market Value Indication $1,160,000**

TRIAL EX. 33 at 58-59.

22

Mr. Benton testified that he uses a database limited to the State of Tennessee and Costar to search for comparables.  He acknowledged that none of the sales he chose as comparables were located in Blount County, and he did not recall if his search returned any properties in Blount County.  Additionally, he testified that he did not maintain information and could not identify any of the excluded properties.  As for his search criteria, Mr. Benton testified that he looked for sales similar in size, age, locational characteristics, and building characteristics.  When questioned by the Debtor's attorney about the determination that Comparable 5 was the most similar to the Ivens Office Building and yet, Mr. Benton determined the value to be $9.55 less per square foot than Comparable 5, Mr. Benton testified that he sometimes eliminates the highest and lowest values, but in this case, he chose a value between the highest and lowest.  The court notes that this $9.55 difference per square foot means a preliminary prospective value of $1,193,230.00 versus a preliminary prospective value of $1,325,889.10.

Mr. Benton also primarily relied on the income capitalization approach, examining five properties located in Alcoa and Maryville, Tennessee, ranging from 9,330 to 35,000 in rentable square footage, from 80.1% to 100% occupancy, and from $11.04 to $16.15 in rental rates.  TRIAL EX. 33 at 62-66.  With respect to an estimation of market rent, the Appraisal Report states "[t]o develop an opinion of market rent, we surveyed representatives of comparable and competitive properties in the local market area, focusing on buildings with similar locations, size and market appeal."  TRIAL EX. 33 at 57.  As with the sales comparison approach, adjustments were made for location, age and condition, construction quality, and design/functional utility.  TRIAL EX. 33 at 67-68.  With respect to age and condition, the Appraisal Report states that "[t]he subject has an

effective age of 22 years.  The five rentals have effective ages ranging from 11 years to 25 years.

We have adjusted for differences in age based on a factor of 0.5% per year." TRIAL EX. 33 at 68.

As for construction quality, Mr. Benton found all of the comparables to "feature similar construction

with no adjustments required." TRIAL EX. 33 at 68.  Finally, as he did under the sales comparison

approach, with respect to design/functional utility, Mr. Benton stated that "one-half of the subject

property's rentable area consists of daylight basement space.  We have applied a downward

adjustment of 5.0% to the comparable rentals to reflect the market's preference for above grade

rental spaces." TRIAL EX. 33 at 68.

Lease comparable 1 is a one-story office building with 15,500 rentable square feet located

in Alcoa, Tennessee.  TRIAL EX. 33 at 62.  This building was built in 1988, has average access, has

average visibility, and was rated as being in average condition.  TRIAL EX. 33 at 62.  The effective

rental rates range from $11.50 to $13.00 per square foot, with a $12.25 average per square foot.

TRIAL EX. 33 at 62.  Tenants are responsible for utilities and janitorial services, and typical lease

terms are three to five years.  TRIAL EX. 33 at 62.  Mr. Benton testified that this comparable was in

his database, and the information was last confirmed in October 2013.

Lease comparable 2 is a one-story three building office complex with 14,350 rentable square

feet located in Maryville, Tennessee.  TRIAL EX. 33 at 63.  This complex was built in 1985, has

average access, has average to good visibility, and was rated as being in average condition.  TRIAL

EX. 33 at 63.  The effective rental rates range from $11.04 to $16.15 per square foot, with a $13.37

average per square foot.  TRIAL EX. 33 at 63.  Lease terms range from three to five years.  TRIAL

EX. 33 at 63.  Mr. Benton testified that he appraised this property in September or October 2013, and he did not update the information for his analysis in this bankruptcy case.

Lease comparable 3 is a one-story office building with 9,330 rentable square feet located in Maryville, Tennessee.  TRIAL EX. 33 at 64.  This building was built in 2002, has average access, has average visibility, and was rated as being in average condition.  TRIAL EX. 33 at 64.  The effective rental rates range from $12.82 to $14.34 per square foot, with a $13.95 average.  TRIAL EX. 33 at 64.  The typical lease term is three years.  TRIAL EX. 33 at 64.  Mr. Benton testified that this property is owned by Mark Ivens's brother, Shawn Ivens, and was appraised in 2008 or 2009.  The information for this property was last confirmed in October 2013.

Lease comparable 4 is a one-story four-building complex with 26,455 rental square feet located in Maryville, Tennessee.  TRIAL EX. 33 at 65.  The complex was built in 1996, has good access, good visibility, and was rated as being in above average condition.  TRIAL EX. 33 at 65.  The effective rental rates range from $13.03 to $14.80 per square foot, with a $13.61 average.  TRIAL EX. 33 at 65.  The typical lease term is four years.  TRIAL EX. 33 at 65.  Mr. Benton testified that this property was appraised in October 2013, and the information was last updated at that time.  Because this property "is located within close proximity to Blount Memorial Hospital, [Mr. Benton] applied a negative adjustment of 5% for superior location."  TRIAL EX. 33 at 68.

Lease comparable 5 is a one-story four-building office complex with 35,000 rentable square feet located in Maryville, Tennessee.  TRIAL EX. 33 at 66.  The complex was built in 1994, has average access, has average visibility, and was rated as being in good condition.  TRIAL EX. 33 at 66.

The effective rental rates average $12.00 per square foot.  TRIAL EX. 33 at 66.  Lease terms range

from three to five years.  TRIAL EX. 33 at 66.  Mr. Benton testified that this property fronts onto

Lamar Alexander Parkway and is just past the Ivens Office Building.  The information for this

property was last confirmed in October 2013.

       With respect to the income capitalization approach, Mr. Benton made the following

conclusions concerning the lease comparables:

> The five rent comparables selected from the available market data present an
> unadjusted range of $12.00 to $13.95 per square foot.

> We adjusted the rent comparables based on pertinent elements of comparison as
> discussed earlier . . . .  The final adjusted rental rates range from $10.71 to $12.49
> with a mean of $11.68 and a median of $11.77.

> The property owner indicated that the rate being quoted to prospective tenants is
> $9.25 to $11.60 per sq. ft. depending on location and the amount of space being
> sought.

> As described earlier, the subject includes both ground level and basement level space.
> All thing [sic] being equal, basement space typically commands a somewhat lower
> market rental rate than ground level space.  Based on our analysis, we have estimated
> a market rental rate of $11.50 for the ground level space and 9.00 [sic] per square
> foot for the basement level space.

TRIAL EX. 33 at 69-70.

       Within the income analysis, the Appraisal Report states that Mr. Benton was not provided

with a rent roll and of the leases he did receive, all but three had expired and, "[g]iven that the

existing leases all have less than 12 months remaining term, it is likely that any potential buyer

would base their income projections on achievable market rental rates.  Therefore, we will base our

estimations on market rent."  TRIAL EX. 33 at 70.  The Appraisal Report states that he requested from

Capital Bank but did not receive copies of all existing lease agreements, and the "[l]ease documents provided by client were largely expired[,]" a current rent roll, and a 3-year history of income and expenses. TRIAL EX. 33 at 3. He did, however, receive quoted rent for the office space and information on expiring leases. TRIAL EX. 33 at 3. He also testified that Capital Bank sent him copies of some leases, but because the bank did not send them all, he created his own rent roll.

Concerning expenses, Mr. Benton testified that he did not receive sufficient detail so he instead sought out expense comparisons which he summarized in the Appraisal Report in the amount of $1.41 per square foot for taxes, $0.20 per square foot for insurance, $1.25 per square foot for utilities, $0.95 per square foot for repairs and maintenance, $0.45 per square foot for roads and grounds, and $0.52 per square foot for management fees. TRIAL EX. 33 at 72-74. After conducting the appraisal, via a letter dated March 25, 2014, Mr. Benton requested information from the Debtor, through Capital Bank and the Debtor's attorneys, and was subsequently provided with the following information by the Debtor's attorney via email:

> There is not a rent roll. I attach a summary of the leases I prepared. You should have a copy of all leases except the recent Skillet Head Media lease. It is also attached.
>
> The rate being quoted to perspective tenants is $9.25 to $11.60 sq. ft. depending on location and the amount of space sought. There are no pending leases. There are no pending terminations/tenants leaving known to the debtor.
>
> The gross receipts for 2011 were $83,200.00. The expenses were $109,976.00. The gross receipts for 2012 were $110,811.00. The expenses were $113,015.00. I do not have 2013 and the debtor has not yet calculated the gross rents or expenses for that year.

TRIAL EX. 35. Mr. Benton also acknowledged that he had been advised in an email from the Debtor's attorney that Mr. Ivens has been quoting rates of $9.25 to $11.60 per square feet, but there

are currently no pending new leases.  *See* Trial Ex. 35.  Additionally, during his direct testimony,

Mr. Benton testified that the Debtor's rental rates of $8.17 to $9.30 per square foot are below market,

which he values at $11.50 per square foot for ground level and $9.00 per square foot for basement

level.  When questioned by the Debtor's counsel, Mr. Benton stated that the values he chose were

subjective, based on his judgment.

Mr. Benton determined that the effective gross income, consisting "of the income from all

operations of the real property after an allowance for vacancy and collection loss has been applied[,]"

was $183,322.00.  Trial Ex. 33 at 71-72.  Using the estimated expense figures, Mr. Benton

determined that the "estimated total stabilized expense for the subject property is $69,240, or $4.93

per square foot.  Of this, $59,802 or $4.26 per square foot is reimbursable."  Trial Ex. 33 at 74.

Accordingly, Mr. Benton determined that the stabilized Net Operating Income was $8.13 per square

foot, for a total of $114,082.00, representing 62.2% of the effective gross income.  Trial Ex. 33 at

75.  To determine the overall capitalization rate, Mr. Benton analyzed "market comparables, investor

surveys and the band of investment technique" to arrive at "an overall capitalization rate between

9.00% and 9.50% considering the location, age and quality of the subject property, as well as current

market conditions."  Trial Ex. 33 at 75-76.  In summary, Mr. Benton's Appraisal Report contains

the following Direct Capitalization Conclusions:

Prospective At Stabilization Fee Simple Market Value Indication
. . . .  As previously discussed, we have estimated a stabilized occupancy of 90.0%.
Using the estimated overall capitalization rate of 9.50% indicates a preliminary
prospective at stabilization fee simple market value indication of $1,200,861.

As Is Fee Simple Market Value Indication
The preliminary market value indication is based on the subject property operating
at a stabilized occupancy.  However, the subject property is currently operating at a

below-stabilized occupancy level of 75.0%, requiring a lease-up adjustment. A lease-up discount of $30,000 was previously estimated in the cost approach.

Applying these adjustments to the prospective at stabilization fee simple market value indication indicates a [sic] as is fee simple market value indication of $1,170,000 (rounded), as of March 24, 2014, based on the direct capitalization technique.

**Direct Capitalization Technique Value Indications**

| | | |
|---|---|---|
| Stabilized Net Operating Income (NOI) | $ | 114,082 |
| Divided by Overall Capitalization Rate | ÷ | 9.5% |
| **Preliminary Prospective At Stabilization Fee Simple Value Indication** | | $1,200,861 |
| **Prospective At Stabilization Fee Simple Market Value Indication** | | **$1,200,000** |
| Less Lease-Up Discount: | | $   30,000 |
| **As Is Fee Simple Market Value Indication** | | **$1,170,000** |

TRIAL EX. 33 at 77. At trial, Mr. Benton testified that he anticipated the Debtor could reach a 90% stabilization rate within a year.

As previously stated, the only evidence of the Ivens Office Building's value in the record is the Appraisal Report prepared by Mr. Benton and his trial testimony assigning a value of $1,170,000.00 and a stabilized value of $1,200,000.00. Nevertheless, both Mr. Benton and Mr. Sigmund, the Senior Vice President and Regional Executive for First National Bank in Blount County, testified that the rental market in Blount County is improving and that the Ivens Office Building is in a good location. Mr. Benton also testified that he believes the Debtor can achieve stabilization within one year. The total payoff for Capital Bank's loan, as of April 22, 2014, was $1,041,932.66. *See* TRIAL EX. 4. That amount is less than the $1,170,000.00 "as is" value assigned

29

to the Ivens Office Building by Mr. Benton in his Appraisal Report and less than the $1,200,000.00

"prospective at stabilization" value.  *See* TRIAL EX. 33 at 78.  The Debtor has stable tenants, who

have remained tenants through two foreclosure attempts by Capital Bank and the Debtor's

bankruptcy case.  The Debtor is working to increase the number of tenants to a minimum of 90%,

and Mr. Benton testified that he believes that the Debtor can achieve this number within one year.

However, because the $1,200,000.00 value is based upon "prospective stabilization," i.e., increased

future tenant occupancy, the court finds $1,170,000.00 to be representative of the value of the Ivens

Office Building for purposes of this confirmation hearing.  Accordingly, the court finds that the

Amended Plan provides Capital Bank with fair and equitable treatment and allows it to retain its lien

to the extent of its allowed secured claim.

Capital Bank also argues that the Amended Plan is not fair and equitable under

§ 1129(b)(2)(A)(i)(11) because it does not provide for an appropriate rate of interest that includes

a risk factor as required by *Till v. SCS Credit Corp*., 541 U.S. 465, 124 S. Ct. 1951, 158 L.Ed.2d 787

(2004).  Under *Till*, the analysis "the formula approach, which begins with a concededly low

estimate of the appropriate interest rate and requires the creditor to present evidence supporting a

higher rate, places the evidentiary burden on the more knowledgeable party, thereby facilitating more

accurate calculation of the appropriate interest rate."  *Till*, 541 U.S. at 484-85.  In the Sixth Circuit,

"the market rate should be applied in Chapter 11 cases where there exists an efficient market[, b]ut

where no efficient market exists for a Chapter 11 debtor, then the bankruptcy court should employ

the formula approach endorsed by the *Till* plurality."  *In re Am. HomePatient, Inc*., 420 F.3d 559,

568 (6th Cir. 2005).  Prior to the trial, the parties stipulated that there is no effective market for the

Debtor's loan; therefore, the starting point is the prime rate of interest, which is then adjusted according to the risk of default, and "the parties' original contract rate of interest is irrelevant." *In re Hudson*, 2011 WL 1004630, at *6, 2011 Bankr. LEXIS 1010, at *17 (Bankr. M.D. Tenn. Mar. 16, 2011) (citing *In re Riley*, 428 B.R. 757, 765 (Bankr. N.D. Ohio 2010)). In determining the risk factors, the court must consider "(1) the probability of plan failure; (2) the rate of collateral depreciation; (3) the liquidity of the collateral market; and (4) the administrative expenses of enforcement." *Till*, 541 U.S. at 484. Although the Supreme Court did not endorse a percentage range for risk, "other courts have generally approved adjustments of 1% to 3%." *Hudson*, 2011 WL 1004630, at *7, 2011 Bankr. LEXIS 1010, at *17 (quoting *Till*, 541 U.S. at 480).

The parties do not dispute that prime rate is currently 3.25%. Prior to trial, the Debtor revised its proposed interest rate from 4.25% to 5.25% over a 30 year amortization. Additionally, the Debtor clarified that all default provisions contained in the original Note would remain in effect, and Capital Bank's lien would not be affected. Although there are certainly risk factors such as ability to repay, loan to value ratio, liquidity, and cash flow, the court recognizes that those risk factors are inherent in any loan. The court also recognizes that the proposed 2% adjustment over prime falls at the higher end of the range generally approved by courts. Because Capital Bank is protected by its default provisions and its lien on the Ivens Office Building, the court believes that the 2% over prime is sufficiently fair and equitable to Capital Bank. In the event that the Debtor does not or cannot make its debt service payments to Capital Bank as required by the Amended Plan, Capital Bank will still have every recourse available under its Promissory Note, Deed of Trust, Change in Terms Agreement, and applicable state law.

31

In summary, the court finds that the Debtor has met its burden of proof by a preponderance of the evidence and that the Amended Plan is feasible and fair and equitable in its treatment of Capital Bank.  The court, having fixed the value of the Ivens Office Building at $1,170,000.00 and Capital Bank having established the payoff on the December 10, 2009 Note at $1,041,932.66, also finds Capital Bank's claim to be fully secured together with additional interest and attorney fees accruing to the date of the effective date of the Debtor's plan, not to exceed $1,170,000.00.

The Amended Plan, subject to modification in the manner set forth herein, shall be confirmed.  To that end, the Debtor will be directed to file, within ten days, a modified plan setting forth the 5.25% interest rate to be paid on Capital Bank's Class 3 secured claim.  The modified plan shall also clarify any ambiguity regarding the amount of Capital Bank's secured claim and shall contain language that the default provisions of the December 10, 2009 Note executed by the Debtor, as modified by the January 28, 2013 Change in Terms Agreement, and the default provisions of the December 10, 2009 Deed of Trust securing the Note will be in effect throughout the term of the plan.  The Debtor will be directed to tender an order confirming the modified plan with a copy of the plan attached thereto.

An Order consistent with this Memorandum will be entered.

FILED:  May 8, 2014

BY THE COURT

*/s/  RICHARD STAIR, JR.*

RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE